FILED IN CLERK'S OFFICE
U.S.D.C   Atlanta

MAY 3 1 2007

JAMES N HATTEN, Clerk
By *JKPonch*   Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICHARD V. HARRISON, | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE NO. |
| vs. | ) 1-07-CV-1220-JEC |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES (IBM) CORP , | ) |
| Defendant. | ) |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Richard V Harrison, Pro Se, and pleads as follows.

## I. PRELIMINARY STATEMENT

1

This is an action seeking remedy and redress for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Civil Rights Act of 1866, 42 U S C. § 1981 ("Section 1981").

2.

Plaintiff files this suit against Defendant for retaliation in violation of Title VII and retaliation in violation of Section 1981.

## II. JURISDICTION AND VENUE

3

Plaintiff has satisfied the jurisdictional pre-requisites to suit, having timely filed an Equal Employment Opportunity Commission charge of retaliation, and having received a notice of right-to-sue within ninety (90) days from the filing of this Suit (copy attached)

4.

The federal question jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1331.

5.

Plaintiff is a resident of the State of Georgia, and submits to the jurisdiction of this Court by filing suit.

6.

Defendant International Business Machines Corporation ("IBM") is a foreign corporation present and doing business in the State of Georgia.

7.

IBM is subject to the jurisdiction of this Court

8

All of the acts and omissions complained of herein occurred within the Northern District of Georgia.

9.

Accordingly, venue is proper in this Court.

## III. PARTIES

10.

IBM is in the business of manufacturing hardware, among other things

11

Plaintiff is a Jamaican-Black male and a former employee of IBM

## IV. FACTUAL ALLEGATIONS

12.

Plaintiff was hired by IBM on June 9, 1997, as a Professional Accountant

13.

On October 23 2006, Defendant and its agents were served with a lawsuit brought against it by Plaintiff for discrimination and retaliation in violation of Title VII and/or 42 U.S.C Section 1981 (Harrison v. International Business Machines (IBM) Corp., Case No. 1·06-cv-2549, in the United States District Court for the Northern District of Georgia)

14.

On December 13, 2006, Defendant was served with an "Amended Complaint" (lawsuit) brought against it by Plaintiff for discrimination and retaliation in violation of Title VII and/or 42 U.S.C. Section 1981 (Harrison v International Business Machines (IBM) Corp., Case No. 1.06-cv-2549, in the United States District Court for the Northern District of Georgia)

15

In  June 2006 the decision was made that  Defendant's Customer Fulfillment/Customer Support Organization  (CF/CSO) would be taking over the (full) responsibility of updating  all the Pricing Models associated with Defendant's Open Infrastructure Offerings (OIO) organization.

16.

Consequently, on or around July 2006, Defendant hired two (2) supplemental employees, namely, Sandra Armstrong (Caucasian)) and Richard Perrin (Caucasian), to update the OIO pricing models. Both Ms. Armstrong and Mr. Perrin were provided with extensive training (including in-person) relating to the updating of the Open Infrastructure Offerings (OIO) Pricing Models over an extended period of time

17

On or around June 6. 206, Defendant's OIO management team (including CSO/CFO)

determined that the transition period for the OIO CSO (Customer Fulfillment) Organization taking over the updating of the "OIO Pricing Models" would be completed by "mid-August ," 2006. Subsequently, the date to fully complete the transition to Defendant's CF/CSO group was changed from August 15, 2006, to January 1, 2007.

18

On August 7, 2006, Mr. Vodopia's superior, Stephanie Parke announced that Mr. Vodopia was moving to a new assignment to become the Chief Financial Officer (CFO) for Defendant's Public Sector organization  Ms. Parke mentioned that Mr. Vodopia would be working both positions (i e., OIO and Public Sector CFO) for 4-6 weeks until his replacement was named

19.

In his additional (new) role on or around August 2006, Mr  Vodopia managed two (2) additional Financial Analyst who worked in the Public Sector, namely, James Rhymer (Caucasian), and Doug Franke (Caucasian). In addition, Mr  Vodopia continued to manage Plaintiff and the following OIO Financial Analyst, namely, Tasha Galloway (African-American), Ron Rueckert (Caucasian), and Maryn Schwebel (Caucasian).

20.

On account Defendant's actions and/or inactions, Plaintiff  went out on medical leave on November 16, 2006.

21

While out on medical leave, Defendant's agent, Mr. Andy Vodopia sent a note to Plaintiff relating to Plaintiff's Performance Business Commitment (PBC) results in which he stated, "Richard, if your leave gets extended I will get back to you with a schedule for when this should be completed. If it doesn't use your first day back to complete your results and we will discuss your assignments going forward." In the same note Mr. Vodopia stated, "I'm going on vacation starting Tuesday January 9th so I'd like you to complete your PBC results and submit them by Thursday January 4th Thanks.".

22.

On January 3, 2007, Mr. Vodopia sent Plaintiff a note in which he remarked," We have to get together on what you will be doing going forward  You said you'd be your PBC results yesterday and catching up on mail today. I haven't seen the PBC results come in yet and I don't believe you should a lot of work related mail given that I've assigned the OL Log to Tasha for at least through year-end  Can you tell me when the PBC is going to be completed and what you are currently working on? Thanks."

23.

In Plaintiff's nine years plus employment with Defendant, Plaintiff had never  or

was required to submit his "PBC" results this early in January. In fact, in the previous eight (8) years, Plaintiff customarily submitted his "PBC" results on or around the third week of January.

24

On January 4, 2007, Plaintiff submitted his 2006 PBC results to Mr. Vodopia.

25.

On January 8, 2007, despite Defendant's decision to transition the task (exclusively) of updating the OIO pricing models to Defendant's CF/CSO organization, effective, January 1, 2007, Mr Vodopia continued to retaliate and harass Plaintiff by assigning Plaintiff task intended to set Plaintiff up for failure and to justify Plaintiff's subsequent termination.

26

Among the assignments Mr Vodopia assigned Plaintiff on January 8, 2007 were

a) Pricing Model Update and Contract performance for the following "OIO" contracts, namely, University of Pittsburgh Medical Center (UPMC), Verizon (New Signing), and "DTCC" (New Signing).

b) Contract Performance on The Bank of New York (BoNY), "Same above without Pricing Model update responsibility."

**c)** Plaintiff should review "  . the contract performance with OIO Sales Management and Global OIO Finance on an **every other month basis."**

**d)** Other projects as assigned

27.

On said day January 8, 2007, on a conference call  with Mr. Vodopia and Ms Parke, Plaintiff requested adequate training from Mr. Vodopia and Ms. Parke in order to fulfill Mr  Vodopia's requests above in Paragraph 26,to no avail

28

Plaintiff **was not** provided with training on reporting "Contract performance" in his OIO Financial Analyst position

29.

In addition, Defendant did not provide Plaintiff with the tools (working) that were required to fulfill Mr.Vodopia's requests

30

The OIO Verizon Contract does not have an "IGF" Pricing Model, however, Mr Vodopia on January 8, 2007,  instructed Plaintiff that, "Updating of the pricing models need to be done in the IGF pricing model."

31

Plaintiff soon thereafter discovered that the OIO Pricing Models for "DTCC," Verizon (New Signing) and Bank of New York (new signing) were not ready or available for Plaintiff to update on January 8, 2007, contrary to what Mr. Vodopia confirmed on the conference call with Ms. Parke

32

Furthermore, Plaintiff was not provided with training on pulling "revenue pulls" from Defendant's  Financial Management System (FMS). However, all other OIO Financial Analyst were trained on the FMS tool, including  Maryn Schwebel, Tasha Galloway, and Ronald Rueckert.

33.

It was impossible for Plaintiff to correctly "analyze contract performance to be determined by OL modifications and revenue reports verses planned revenue" without the proper tools and training. An Order Letter (OL) by itself does not provide accurate revenue numbers and in many (most) cases does not reflect revenue numbers.

34.

Mr. Vodopia had foreknowledge that the OIO UPMC had several "Business Controls" and tool issues, including but not limited to:

a) The OIO UPMC Pricing Model was seriously in "arrears" as it relates to the updating of Order Letters." According to Mr Vodopia on or around October 2006, the OIO UPMC contract had approximately 300 Order Letters to update and it would take three (3) months to bring current. However, Mr. Vodopia requested that Plaintiff updated the UPMC pricing model with all its "Executed" Order Letters since Defendant's signing of the OIO UPMC contract on **April 1, 2005 (i.e., two (2) years prior).**

b) The OIO UPMC Pricing Model and ASR models were not "tying out "

c) Defendant's accounting department deemed that the OIO UPMC "ASR" model was "unreconciled."

d) As of 2/28/07, the OIO UPMC Model had a $13M "discrepancy" which had been growing each month.

e) Mark Carioto, the Director of the OIO team has been made aware of the UPMC issues on "Cadence" calls. Mr. Vodopia participates in Defendant's weekly "Cadence" calls

f) Norbert Cardenas was the CF/CSO Account Service Representative (ASR) assigned to UPMC

g) Effective, April 1, 2007, Norbert Cardenas was replaced by Diane Moore as

the ASR on the OIO UPMC contract. Norbert Cardenas has been transferred to another (outside of CSO) organization within IBM.

### 35.

Mr. Cardenas was selected instead of Plaintiff to work on the OIO UPMC contract in June 2005 on the basis that Mr. Cardenas had more "Customer Fulfillment CSO" experience than Plaintiff.

### 36.

Mr. Cardenas was transferred out of Defendant's CF/CSO organization to another position within Defendant's Global Financing organization

### 37.

After the conference call on said day January 8, 2007, Mr. Vodopia instructed Plaintiff to, "Please get with the ASR's to make sure the models get posted. I'm sure the DTCC will be set up shortly but follow up. You can even get with Marie Schram and ask her to make sure all this gets done and ask her when she thinks it will be complete."

### 38

Marie Schram replaced Harry Gornick as the CF/CSO ASR manager on or around April 2006.

### 39.

On said day January 8, 2007, Plaintiff sent a note to the ASR Team Lead, Patti Feeney and copied Mr. Vodopia and asked, "Hi Patti, could you please let me know who is the ASR assigned to the newly signed contract DTCC? Also, do you know when a category for DTCC will be created in Quickplace or point me in the right direction. Thanks in advance."

40

Mr. Vodopia responded to Plaintiff's note in Paragraph 39 above and requested of Plaintiff, "Let me know if she says one isn't assigned."

41.

Ms Feeney did not respond to Plaintiff's note in Paragraph 39 above. Instead, Mr. Vodopia responded again in an instant message and said, "What information are you asking from Patti?" In turn, Plaintiff pointed Mr. Vodopia to the note referenced in Paragraph 39 above and to which Mr. Vodopia responded to in Paragraph 40 above

42.

On January 8, 2007, pursuant to Mr. Vodopia's instructions, " Richard, please feel free to set up a meeting whenever you need direction  Thanks," As such, Plaintiff attempted to schedule a meeting with Mr. Vodopia and Ms. Parke to discuss problems he was encountering with his assignments

43.

Before leaving on vacation Mr. Vodopia scheduled a meeting with Stephanie Parke to review Plaintiff's 2006 PBC results and assessment among themselves on January 15, 2007

44

On January 9, 2007, Ms Schram sent a note to Plaintiff and stated, " Hi Richard, since these deals were just recently signed, we need to have my team time to get them loaded into Quickplace. Alan, can you follow up on this request and let me know when this has been completed?" Ms. Schram was referring the new OIO contract's Mr. Vodopia assigned to Plaintiff on January 8, 2007.

45.

On January 9, 2007, CF/CSO ASR manager, Marie Schram forwarded a note from Patti Feeney in response to Plaintiff's note in Paragraph 39 above. Ms. Feeney responded, " The DTCC QP site has been created... I still need to create forms and there are probably several users that were not in my QP List which will need to be updated to this site .."

46

On January 10, 2007, Alan Knox, who replaced Patti Feeney as ASR Team

Lead, responded to Ms. Schram's note  above in Paragraph 44, and remarked, "**Based on the approved DOU, all parties agreed we would allow 20 days from contract signing to provide final date. Mr. Knox further stated, "Within 20 business days of contract signing deals:**

    a)  IGF will tie out payments and lease type from IGF model to the Aggregation Model to be used for contract management.

    b)  Post execution SAR will occur between QA, SE, IGF, Pricing and "project office" (assigned PE, ASR,FA).

    c)  SE and IGF concur that model ties out to signed contract and IGF analysis (scope and payment/cash flow details).

    d)  Cross brand pricing checks inputs and loads final Plan of Record Aggreation Model to Quickplace."

47

With the exception of the OIO Verizon contract (New Signing), Plaintiff was not invited, attended or participated in any of the  business activities listed in Paragraph 46 above relating to the new OIO DTCC, Bank of New York (New Signing), and UPMC contracts.

48.

On or around January 12, 2007, Plaintiff sent an instant message to the UPMC

ASR, Norbert Cardenas in an effort to obtain the latest version of the UPMC pricing

model.

49.

On said day January 12, 2007, CF/CSO ASR manager, Marie Schram responded,

"Hi Richard, was trying to call you but the number didn't seem to be going through.

Need to ask you a question. Is there a reason why you are contacting the ASR's about

pricing models? My team is confused. Have you been looking into Quickplace for

them?" Consequently, Ms. Schram called Plaintiff at his home and they had a

conversation for approximately 30 minutes.

50.

Plaintiff verified that his messaging service at work was in fact working properly

after speaking with Ms. Schram on January 12, 2007.

51.

On said day, January 12, 2007, Plaintiff's former attorney in an electronic

correspondence to Defendant's counsel requested, **"The only other matter I wanted**

**to bring up is my hope that Mr. Harrison's supervisors refrain from hostile**

**retaliatory conduct (as you know he has returned to work). In all frankness, I have been holding off on an additional EEOC charge in re: continuing retaliation, because I was hoping to focus on this case, not some potential future one."**

52

On January 15, 2007, Mr. Vodopia and Ms. Parke had a meeting relating to Plaintiff's upcoming 2006 PBC" evaluation

53.

Mr. Vodopia and his superior, Ms. Stephanie Parke reviewed Plaintiff's 2006 PBC results with Plaintiff on January 16, 2007. Consequently, Ms. Parke "signed-off" on Plaintiff's 2006 PBC, two (2) days later, January 18, 2007. It took Ms. Parke fourteen (14) days to "sign-off" on Plaintiff's 2005 PBC assessment on 5/18/06.

54.

Plaintiff was assigned his second consecutive PBC rating of "3" on January 16, 2007 by Mr Vodopia and Ms. Parke.

55.

Prior to working for Mr Vodopia, Plaintiff received eight (8) consecutive PBC ratings of "2" (i e. exceeded/met all commitments and/or "Solid Contributor") from-at

the least-five (5) different IBM managers

56.

In addition, in said meeting on January 16, 2007, Mr. Vodopia informed Plaintiff that he was "being offered the opportunity to voluntarily leave IBM with a Minimized Separation Payment and other benefits offered pursuant to IBM Individual Separation Allowance Plan (ISAP)."

57.

Mr Vodopia informed Plaintiff, " You will have 30 days (until February 15, 2007) to review the payments and benefits associated with the ISAP, as well as all other terms and conditions which apply to receiving these payments and benefits"

58

Mr Vodopia further stated, "The decision whether to accept the ISAP is completely up to you. If you choose not to accept the ISAP and your performance has not improved during your 30 day review period of the ISAP, your performance will be rated unsatisfactory based on your consistent low performance and you will be put on a 30 day formal performance improvement Plan."

59

Mr. Vodopia warned Plaintiff, " If, after not accepting the ISAP initially offered

to you, you do not fully meet all of the performance objectives of the improvement

Plan to IBM's satisfaction (i e , performance of at least a "Solid Contributor"), you will

be separated from IBM and be ineligible for any separation plan payments or benefits."

60

Mr. Vodopia's last sentence in his " Follow up to PBC Discussion," note stated,

"Please note that because of your consistent low performance, you are not eligible to

transfer to another opportunity within IBM at this time "

61

As of January 1, 2007, Mr Vodopia was no longer the OIO Chief Financial

Officer (CFO) and began working for Defendant's IBM.com organization. In his new

role as the Business Deveopment Executive (BDE) for Defendant's IBM.com

organization, Mr. Vodopia was no longer a manager (i.e., no longer had any "Direct

Report" working under him).

62.

Plaintiff was unable to schedule a meeting (for directions) with Mr. Vodopia

and Ms Parke until January 17, 2007 for he following reasons: Mr. Vodopia was on

vacation from January 9, 2007 through January 13, 2007, returning to work on Monday,

January 15, 2007;  Ms. Parke's availability; Ms. Parke and Mr. Vodopia were working

together on (preparing) Plaintiff's 2006 "PBC" assessment

63

On said day, January 17, 2007, Plaintiff's followed Defendant's guidelines and requested that Mr. Vodopia's Administrative Assistant, Ms. Teresa Alexander ordered office supplies Plaintiff needed  Plaintiff had been working fulltime from home since on or around March 2006 and requested  the supplies to be shipped to his home address as was his custom.

64.

On January 22, 2007, Ms. Alexander called Plaintiff and informed him that Mr Vodopia insructed her that Defendant's policy had changed and, as such,  the supplies Plaintiff ordered had to be shipped to Plaintiff's IBM (work) office address. Ms. Alexander also informed Plaintiff's that Mr  Vodopia instructed her to order only one (1) toner cartridge, despite Plaintiff's request for three (3)-as was his custom.

65.

Plaintiff sent Mr. Vodopia  a note relating to his conversation  with Ms. Alexander  above in Paragraph 64 and asked, "Could you please let me know if this is a new IBM policy?"

66

Mr. Vodopia responded, " I didn't know you asked Theresa to ship this to you  In the past I thought you were coming in to pick up supplies so when she asked me what to do I told her you'd probably pick them up on your next trip in "

67.

Consequently, on said day, January 22, 2007,  Mr  Vodopia sent a note to Ms. Alexander and instructed, "Theresa, please ship the supplies to Richard "  In turn, Ms. Alexander advised Defendant's North America Procurement Operations Centre, Staff, Harleen Bhardwaj to ship the supplies to Plaintiff's home address.

68

On said day, Monday, January 22, 2007. Ms. Bhardwaj responded to Ms. Alexander and stated, "Delivery address has been changed as per your note below. Thanks."

69

On account of Plaintiff printing papers running low , on Wednesday, January 24, 2007,  Plaintiff stopped by Defendant's office  building to obtain printing paper.

70.

On said day, Wednesday, January24, 2007 Plaintiff  met   Ms. Alexander in person for the first time as Ms. Alexander was fairly new to the OIO organization.

71

Ms. Alexander informed Plaintiff that she was very displeased because they still shipped the supplies to the office address despite her instructions to ship them to Plaintiff's home address

72

Ms. Alexander informed Plaintiff that Mr. Vodopia came to her and instructed her **NOT to** ship the supplies to Plaintiff's home address   Contrary to Mr  Vodopia's statement in Paragraph  66 above, Ms. Alexander vehemently denied Mr. Vodopia's claim that, "she asked me what to do I told her you'd probably pick them up on your next trip in."

73

Around the said time frame, Mr  Robert Harmon (Caucasian), was Defendant's "Assigned Approver" for defendants "S & D" Finance "Buy On Demand (BOND) orders . i.e. supplies.

74.

On said day, January 22, 2007, Mr  Harmon approved Ms. Alexander BOND order at or around 1 16pm

75

Mr Harmon is a personal friend of Mr. Vodopia. In fact, Mr Vodopia was Mr

Harmon's manager when they both worked in Defendant's "IBM com" organization

76

On said day, Wednesday, January 24, 2007, Plaintiff observed that Mr. Vodopia

had vacated his office at Defendant's Atlanta Hillside building. Apparently, Mr.

Vodopia relocated to his new office at Defendant's Smyrna site (building).

77.

On Said day Wednesday, January 24, 2007, Mr. Vodopia forwarded to Paintiff a

note that confirmed that the OIO Verizon (New Signing) pricing model was not ready

as of 1/23/07.

78.

On said day, Wednesday, January 24, 2007, Plaintiff attended another meeting

with Mr. Vodopia and Ms. Parke to address the problems Plaintiff was experiencing

with the OIO UPMC contract (i.e., Pricing Model, Order Letters, etc) -to no avail.

79.

On or around January 25, 2007, Plaintiff's former attorney filed "On-going

Retaliation" charge with the Equal Employment Opportunity Commission (EEOC)

against Defendant.

80.

On around Thursday, January 25, 2007 through and including Friday, January 27, 2007 Defendant's "Quickplace" tool was inaccessible. Plaintiff needed to access Defendant's "Quickplace" tool in order to effectively perform his assignments.

81.

On February 1, 2007, Plaintiff attempted to schedule a meeting with the OIO Project Executive assigned to the UPMC contract, Mr. Mike Dougherty. Plaintiff sent a note to Mr. Dougherty and copied Mr Vodopia in which Plaintiff requested assistance (guidance) with the problems he was experiencing with updating the UPMC pricing model. Mr. Vodopia responded, "Please invite me to this meeting also. Thanks."

82.

Mr Dougherty responded in two (2) separate notes and among other things stated, "What I don't know is how you will represent this in the PM itself as UPMC has, on occasion, used 30-40 discrete transactions, ie OLs, to consume one line in the PM. But the concept is that as soon as we substitute or alter capacity, the PM line represents funding available and not an individual machine or set of machines."

83.

Despite, Defendant's decision that the CF/CSO organization was now

responsible (entirely) for updating the OIO Pricing Models (PM's), Mr Vodopia

responded to Mr. Dougherty's note referenced in Paragraph 82 above and requested of

Plaintiff, "I would like you to document this process as you go along  Please consider

updating desk procedures as part of your assignments if you haven't already, Thanks "

84.

Plaintiff was not provided with training nor understood the OIO "Substitution

Value" concept as it relates to "the pricing model updating process." In fact, the UPMC

pricing models ("IGF" or "AGG") were never utilized for tracking transactions relating

to "Substition Value " It was the responsibility of the Account Service Representatives

(ASR's) in Defendant's CF/CSO group to manage the "Substitution Value" as it relates

to the OIO Pricing Models. Moreover,the ASR group were already performing the task

of managing the "Substitution Value" relating to the OIO UPMC contract

85.

Consequently, Mr Vodopia responded to Plaintiff and stated," Just be aware that

you may have to develop the process as opposed to someone doing it for you. Use the

experts to help you understand what is needed but you should take the lead on this."

86

On Monday, February 5, 2007, Mr Vodopia sent Plaintiff a meeting invitation

for Tuesday, February 6, 2007 at 09:30 AM- 10:00 AM. The subject of the meeting was

"OIO" Announcement." Plaintiff was the only invitee

87.

Plaintiff responded to Mr. Vodopia's invitation via a note and copied Ms. Parke.

On account of a previously scheduled doctor's appointment, Plaintiff requested that Mr.

Vodopia rescheduled the meeting and invited his superior, Ms. Parke.

88.

Ms. Parke responded," Richard - - I will definitely attend this meeting  In

addition I'm inviting Michelle Ames - - our HR partner - - I thought it might be a good

idea to have her available t answer any questions you may have (or that any of us may

have.) I'll dial everyone in. Thanks for sending the note."

89.

Mr. Vodopia rescheduled the meeting for 10:30AM-11:00AM on said day,

February 6, 2007, and invited Ms  Parke this time.

90.

In the "OIO Announcement" meeting, Mr. Vodopia announced that he "will be

moving on to a new role," Mr. Vodopia also confirmed that he would  no longer be a

people manager. In addition, Mr. Vodopia mentioned that my team members, namely,

Ronald Rueckert and Tasha Galloway were transferred to different managers within

IBM

91

In addition, after the "OIO Announcement" meeting, Mr. Vodopia sent a note to

Plaintiff in which he stated, "As explained in my note from January 16, because you

have received a **second PBC '3'** performance assessment, you are **ineligible** to transfer

at this time  Therefore, Stephanie and I will continue to manage your day to day

responsibilities for the near term (i.e.through your 30-day consideration period of the

package and if you **choose to decline the package, through your 30- day**

**performance improvement period).**

92

Between February 6, 2007 and February 8, 2007, Mr. Vodopia travelled on a

business trip to Washington D.C. relating to his new  assignment in Defendant's

"ibm.com" organization. At that point, Mr. Vodopia was no longer a manager.

93

On Wednesday, February 7, 2007, Mr  Vodopia sent an "Announcement"  note

to his " Systems Assurance Review" distribution  list. Among other things, Mr.

Vodopia  wrote

a) "Yesterday Stephanie Parke announced that I will be taking a new role in ibm.com as the Business Development Executive for Federal. This is effective retroactive 1/1."

b) "I've watched the business grow from a $500M a year to a $2B+ offering where we do individual deals worth as much as we used to do in an entire year"

c) "As part of this announcement Ron Rueckert will now report into Dave Bravmann  The linkage between the OIO F&P team pricing has always been so strong so this is a natural fit. Tasha Galloway will now report to Peter Gagliardi. Tasha's activities directly support the work that the PE's do."

d) No mention of Plaintiff was made in Mr. Vodopia's announcement note to the OIO organization.

94

On Tuesday, February 13, 2007, Mr. Vodopia  attended a conference meeting with Defendant's Human Resource Partners, Michelle Ames and Thomas Huges, Director of OIO, Mr. Mark Canoto  The subject of the meeting was "FA Transfer."

95.

On Thursday, February 15, 2007, Mr. Vodopia invited Plaintiff to a meeting, the subject being, " Follow-up to PBC Discussion."  Michelle Ames, HR Partner and Mr Vodopia's boss, Stephnaie Parke attended.

96

In the "Follow-up to PBC Discussion" meeting, Mr. Vodopia  twice asked Plaintiff if he was accepting the Minimized Separation Package (ISAP) that Defendant offered to Plaintiff on January 16, 2007. Plaintiff twice responded "No."

97.

Consequently, on said day, Thursday, February 15, 2007,  at 08:53PM, Mr Vodopia sent Plaintiff a note in which he requested, " Richard, per our conversation today, please send me the following information by 5pm Monday, February 19 " Mr. Vodopia requested:

a)  "Pricing models, along with the updates you made for the following contracts. UPMC, DTCC and Verizon."

b)  " Include one sentence for each model starting how many OL's were updated. If there were no updates, still send the model along with a sentence stating that no updates were made."

c)  "Send me the planned revenue by contract by brand, by quarter for 3

28

contracts above plus BoNY."

d)   "Send me any revenue/profit analysis that you have done "

98.

On Monday, February 19, 2007, Plaintiff sent a note to HR Partner Michelle
Ames requesting, " that IBM also transfer" Plaintiff "…to the appropriate first and
second line managers in the like manner Ms. Galloway and Mr. Rueckert were."

99

On Tuesday, February 20, 2007, Ms. Parke responded to Plaintiff and stated,"
Richard, I'm responding to your note to Michelle below, as previously discussed you
are ineligible to transfer to another area at this time." Ms. Parke further stated:

a)   "Therefore, you will report to me and Andy and I will continue to
manage your day to day responsibilities "

b)   "Andy will remain involved because he has been the manager of this
area for over two years, is familiar with the day to day work and
therefore has the ability to assess the completeness and quality of this
work  Also, as we discussed, I will be involved in all discussions and
decisions affecting your work "

c)   "As you stated in the meeting last week, and also below, you did not

29

accept the Individual Separation Allowance Plan (ISAP) that was offered to you. Therefore, if, after reviewing the additional information you were requested to submit, it's determined that your performance has not improved over the last 30-days, you will be rated unsat and put on a 30-day formal performance improvement period."

d) "Michelle, Andy and I will meet with you in next day or two to discuss. If you do not meet the objectives of that improvement plan you will be separated from IBM and will be ineligible for any separation plan payments or benefits "

e) "If you successfully meet the objectives of that Plan to IBM's satisfaction (performance of at least a "solid contributor"), a decision will be made at that time with regard to where you/your work should be transferred to."

100

On said day, February 20, 2007, Plaintiff responded to Ms. Parke, and pleaded with her again to remove Plaintiff "from the harassment and hostile work environment" that he had been subjected to.

101.

The next day, February 21, 2007, Ms. Parke responded and stated, "Richard as we've discussed the IBM appeals process remains open to you if you feel that you have been harassed or subjected to a hostile environment and want an additional review of your concern. As stated in my note below, we'll be scheduling a meeting for tomorrow afternoon to discuss the next steps with respect to your performance. We will send you a meeting notice and materials for discussion in advance of that meeting."

102

Defendant has consistently denied Plaintiff the opportunity to utilize Defendant's "Panel Review" Corporate Appeals Process

103.

Plaintiff consistently complained that Defendant's internal policies, including but not limited to, Defendant's Appeals process, specifically, Defendant's "Open Door Appeals," performance evaluation process, namely, Personal Business Commitment (PBC), and promotional polices, are among other things, "intertwined," inherently flawed (subjective), and have an adverse impact on minorities, including but not limited to Blacks, Jamaicans, Africans, Trinidadians, and others of West Indian and Middle-Eastern ethnicities

104

In fact, Defendant's internal policies, practices and procedures (i.e., Open Door, PBC, etc.) perpetuates and continues discriminations of the past

105.

Consequently, Plaintiff is in the process of litigating (in his prior lawsuit referenced in Paragraphs 13 & 14)) the adverse impact that Defendant's internal policies have to the disadvantage of blacks, Jamaicans, Males, and other "protected" groups.

106.

Nevertheless, on said day, February 21, 2007 at 6:37 PM, Plaintiff in an instant message correspondence via "NotesBuddy" with Ms Parke stated:

a)   " Hi Stephanie, I'm unable to access your note at the moment (server not responding), however, I need some extra time to discuss the issues I raised regarding Andy not being a "People Manager" anymore with my attorney before we proceed with the meeting tomorrow. i.e., in the event Andy will be present."

b)   "I'm not declining to attend the meeting. However, due to the impending litigation, I have to consult my attorney first. Thanks for your understanding in this important matter."

107.

In turn, Ms Parke responded, "of course you can talk to whomever you want –– we'll be setting the meeting up around 2:30 OR 3(ish) tomorrow afternoon and you, me, michelle and andy are expected to attend"

108.

Plaintiff responded on said day at 6:45 PM, "Stephanie, I requesting more time. It's too late in the day to contact my attorney." I ha d an issue with Andy attending > He is no longer a People Manager" and should no longer be involved in my personnel records. If you can't afford me more time until I can contact my lawyer, I am requesting to speak to your boss Stan, as you know how I feel about the "Open Door" process  It discriminates against Blacks."

109.

Ms. Parke responded  at 6:47 PM, " ı`ll cal you now for a brief conversation. What's your phone?"

110.

In turn, Plaintiff responded at 6:48 PM, " Stephanie, I need to discuss with my attornet..I`m very disturbed by the recent events ..attorney."

111

Ms  Parke responded at 6:49 PM,  "rıchard  whats your phone?"

112.

Ms  Parke already had Plaintiff's home phone number, however, Plaintiff

provided Ms. Parke with his phone number again

113.

On said day, February 21, 2007 at 6:51 PM, Ms. Parke called Plaintiff's home.

114

During the above telephone conversation with Ms  Parke, Plaintiff requested

more time to consult Ms. Parke's superior, Mr. Stan Sutula.

115.

The next morning, February 22, 2007 at 9:22 AM, Ms. Parke sent an instant

message to Plaintiff and wrote, " morning Richard - - I want to make sure I'm clear

from last night - - ı think I asked you to just contact stan's office directly if u want to

chat with him.   Correct?"

116.

Plaintiff replied to Ms. Parke's question above and wrote, "morıng Stephanie,

Stephanie, I'm waiting to hear from my attorney and I'm also requestıng of you to stop

you harassment. It's impossible for me to work under these circunstances "

117

At 3:41 PM on said day, February 22, 2007, Ms. Parke sent another instant message to Plaintiff and wrote, " hi Richard - - I just tried to call you but you likely are working remote  what's  your phone number  again?" Plaintiff provided Ms  Parke with his home phone number again.

### 118.

Ms. Parke was aware that Plaintiff had been working remotely (i.e , fulltime from home since March 2006 )  In fact, Ms. Parke was the one that authorized that Plaintiff could work from home and had communicated with Plaintiff from his home on several occasions since March 2006

### 119.

At 4:12 PM on said day, February 22, 2007, Ms. Parke sent a note to Plaintiff and remarked, "Richard - - as I conveyed on my brief phone call to you, and per your request to put it "in writing" --Stan's office will contact you to set this up today or tomorrow." Plaintiff  had already sent a note to Mr  Stan Sutula at 9:49 AM that said morning.

### 120.

Consequently, Plaintiff had a meeting with Ms  Parke's boss, Mr. Stan Sutula on Friday, February 23, 2007, at 09:00 AM

121

Among the concerns Plaintiff discussed all with Mr. Sutula were:

    a)  The harassment Plaintiff was subjected to

    b)  The hostile work environment Plaintiff was working under.

    c)  The fraudulent activities with various OIO contracts, most recently, the

        OIO Verizon contract that was signed on or around 12/30/06.

    d)  Mr Vodopia being involved in Plaintiff's personnel (disciplinary)

        activities (PBC) although Mr Vodopia was no longer a manager

122.

On said day, Friday, February 23, 2007 at 02.25 PM, Ms. Parke sent a note to Plaintiff and wrote, "Richard - - in our meeting on Monday we'll be going through the status of the "2007 Assignmets" - - sent to you by Andy on January 8, 2007 (original note is forwarded below)."

123

Plaintiff responded to Ms. Parke and wrote, "Stephanie, please note I'll attend the meeting against my will (.e., under duress). I object to Andy and Michelle Ames being on the meeting n question ."

124.

On Monday, February 26, 2007, at 9:30 AM  Plaintiff had a conference meeting with Ms  Parke, Mr  Vodopia, and Ms. Ames. The subject of the meeting was "2007 Performance Objectives,"  Among other things:

a) Plaintiff was assigned a "PBC" rating of  "4" (unsatisfactory)

b) Consequently, Plaintiff  was immediately placed on a **"Formal 30 Day Improvement Plan"**

c) Plaintiff was provided with  an **"Improvement plan" authored solely by Mr. Vodopia** who was no longer a manager. Ms. Parke sent the "Improvement Plan" to Plaintiff at <u>**5:31 PM**</u> on this said day

d) Plaintiff was told, "..you will be invited to a mandatory meeting every Thursday morning."

e) Ms. Parke scheduled  the first  of five mandatory, "2007 PERFORMANCE OBJECTIVES-CHECKPOINT" meeting two (2) business days later on Thursday, March 1, 2007, at 08:00 AM. Upon Plaintiff's request the meeting was moved from 08:00 AM to 9:00 AM

125

In the said "2007 PERFORMANCE OBEJECTIVES  meeting on Monday,
February 26, 2007, Plaintiff again requested that Ms  Parke provided the training and
tools necessary to perform his assignments-to no avail  In fact, Mr  Vodopia responded
that the meeting was not meant to address any issues relating to training

126.

The next day, Tuesday, February 27, 2007, Plaintiff received a note from Ms
Parke's boss, Mr. Sutula in which he wrote among other things, " Richard, In our call
last Friday we discussed the items in your note below  I continue to believe that you
have been and are being treated fairly by your management."

127.

The "2007 PERFORMANCE OBJECTIVES-CHECKPOINT" meeting on
March 1, 2007, at 09:00 AM  was attended by Ms  Parke, Ms  Ames, and Mr  Vodopia.
Plaintiff repeated that he was "unable to make any comment at that time."
Consequently, Ms. Parke scheduled the next "2007 PERFORMANCE OBJECTIVES-
CHECKPOINT" meeting for a week later on Thursday, March 8, 2007 at 09:00 AM.

128.

Again, during the ""2007 PERFORMANCE OBJECTIVES-CHECKPOINT"
meeting held on March 8, 2007, Plaintiff made no comments because, among other

things, Defendant failed to provide Plaintiff with the training and tools necessary to perform the "2007 PERFORMANCE OBJECTIVES." Moreover, Plaintiff objected to Mr Vodopia being involved in his personnel (disciplinary) issues, as Mr. Vodopia was no longer a "People Manager" at that point and had moved on to a new role (management chain) in Defendant's IBM.com organization.

129.

On said day, March 8, 2007 at 06:21 PM, Ms. Parke sent a note to Plaintiff in which she wrote, " Richard, We've had two checkpoint meetings to discuss your progress agaist your Performance Improvement Plan objectives. In both meetings, you repeatedly responded that you have no comment with regard to your progress against the plan. I'd like to confirm that this also your recollection of these meetings. If it is not, please respond   I'll also be sending a calendar invite for the next meeting shortly." Plaintiff responded, "Stephanie, no comment at this point. Thanks "

130.

Ms Parke scheduled the next, : "2007 PERFORMANCE OBJECTIVES- CHECKPOINT" meeting for Thursday, March 15, 200 at 09:00 AM.

131.

On or around March 14, 2007, Plaintiff was seen by his private physician on

account of various health concerns (i.e., symptoms) Plaintiff was experiencing

132.

Consequently, after performing various medical tests, Plaintiff's medical doctor recommended that Plaintiff discussed her diagnosis of Plaintiff with his Psychiatrist on his next office visit that was scheduled for March 31 2007.

133

In the interim, Plaintiff's primary medical doctor prescribed a medication for Plaintiff to "take as needed."

134.

On Tuesday, March 20, 2007, Plaintiff took a Personal Choice Holiday (PCH) and visited Defendant's counsel office to inspect and copy documents related to his lawsuit in Paragraphs 13 & 14 above

135.

Plaintiff inspected approximately 3289 pages on this said day March 20, 2007. On account of the amount of documents Plaintiff was presented with by Defendant's counsel (14,415 pages), Plaintiff called Ms Parke and was approved to take the following week off (i.e. March 26-30) to complete inspecting and copying documents

136.

On or around, Friday, March 23, 2007, Plaintiff received two (2) separate "calendar" invitations from Ms. Parke and Mr. Vodopia (independently) scheduling, the fourth (4th) "2007 PERFORMANCE OBJECTIVES-CHECKPOINT" meeting. However, Ms. Parke's invitation was scheduled for 12:15PM, and Mr. Vodopia's invitation was scheduled for 3PM. Plaintiff also observed that Ms. Parke was not invited to Mr Vodopia's meeting

137

Consequently, Plaintiff sent a note to Ms Parke and wrote, " Stephanie, please let me know if should attend both (see print screens below) meetings today?- I received another invitation from Andy this morning with the same "Subject" matter. Thanks."

138.

In turn, Ms. Parke responded, " Richard - - I didn't have an available assistant yesterday. The meeting will be rescheduled for 3PM and a new meeting notice will be sent out by Ellen Breuning."

139.

Again, On this said day, March 23, 2007, Mr Vodopia , Ms Ames and Ms Parke attended the fourth "2007 PERFORMANCE OBJECTIVES-CHECKPOINT "

In this meeting, Ms. Parke and Ms Ames, with foreknowledge that Plaintiff would be on vacation the week of March 26, demanded that Plaintiff called in for his fifth (5th) "2007 PERFORMANCE OBJECTIVES-CHECKPOINT,"

140

Plaintiff responded in a note to Ms. Parke at 03:21 PM, "Stepahnie, as a follow-up to the meeting a few minutes ago, I informed you that I will be on vacation all of next week 3/26/07 through (including) 3/30/07-Personal Choice Holidays included- and will not be available to call into any meetings on account of personal reasons. Although you insisted you had the right (authority) to schedule the meeting next Thursday "

141.

Ms Parke responded over (2) hours later at 05:28 PM, "Richard, We'll schedule the mandatory meeting for Monday, April 1. Thank you " And corrected at 05 29 PM, Sorry - - I mean Monday April 2. Thank you."

142.

On Monday, March 26, 2007 through Thursday, March 29, 2007, Plaintiff visited Defendant's counsel's office and completed his inspection of 14, 415 pages that Defendant's provided for "inspection and copying." Plaintiff returned on Friday to pick up the remaining copies of the documents that were "flagged" the day before.

143.

On or around Wednesday, March 28, 2007, Plaintiff received a call from the Court ordering him to a hearing (conference), to appear before Magistrate Judge Janet F. King on April 4, 2007

144

On Thursday, March 29, 2007, Defendant's counsel informed Plaintiff that they had contacted the Court and requested the hearing  According to Defendant's counsel, they requested the hearing because Plaintiff would not consent to "stay" his current lawsuit and combine the " Right To Sue" letter that was issued by the EEOC on March 3, 2007, into one lawsuit.

145

On Saturday, May 31, 2007, Plaintiff had his follow-up visit with his private doctor

146.

On account of Defendant's actions and/or inactions, Plaintiff's medical conditions worsened  Consequently, Plaintiff's private doctor placed Plaintiff on medical leave immediately.

147.

On Sunday, April 1, 2007, Plaintiff's private doctor, pursuant to Defendant's guidelines, completed and successfully faxed Defendant's Medical Treatment Report (MTR) and Psychiatric Impairment Report (PIR) to Defendant's Global Well-being Services department (IGWBS).

148.

Consequently, at or around 06:00AM on Monday, April 2, 2007, Plaintiff called Ms. Parke and left a voicemail message relating to being out on sick leave.

149

On or around 02:30 PM on this said day Monday, April 2, 2007, Ms Parke and Ms. Ames (HR Partner), irrespective of Plaintiff's medical condition and being out on medical leave, called Plaintiff's home to conduct an **unscheduled** meeting.

150

Plaintiff pleaded with Ms. Parke and Ms. Ames to respect that he was out on sick leave and they were only adding to the health issues he was experiencing- the reason Plaintiff's doctor placed him on medical leave again on 3/31/07  As such, Plaintiff advised Ms  Parke and Ms. Ames to contact Defendant's Health Department (IGWBS) as Plaintiff's doctor had faxed to Defendant the appropriate documentation on Sunday April 1, 2007.

151.

At or around 06:00 PM on this said day, April 2, 2007, "City Express" courier services attempted to deliver an "unidentified" package to Plaintiff's home.

152.

Because "City Express" could not inform Plaintiff the source of the "unmarked" package, Plaintiff refused to sign for the package. Consequently, Plaintiff called the local Sherrif department and filed a complaint.

153

The next day, Tuesday, April 3 ,2007, Plaintiff found a "DHL" Courier Service package on his front door steps that was sent by Defendant.

154.

On or around 04:30 PM on this said day, April 3, 2007, a "DHL" driver returned to Plaintiff's home and demanded that Plaintiff signed for the package that was left at his front steps earlier that morning.

155

The DHL driver called the local Sheriff office and reported that Plaintiff would not sign the package

156

After conversing with the "DHL" driver and Plaintiff, the Sheriff determined that Plaintiff did not do anything wrong because the package did not require a signature Otherwise, the "DHL" driver would not have left the package at Plaintiff's front door earlier that morning. The next day, the same" DHL" driver informed Plaintiff that Defendant instructed his company (DHL) to return to Plaintiff's home that evening to obtain the signature.

157.

The DHL package contained a letter from Ms. Parke in which she wrote, "Richard, This is to inform you that on March 29th it was determined that you did not meet the objectives of your 30-day Performance Plan which ended on March 28, 2007 Due to your vacation plans we were unable to communicate this decision to you before today  Therefore, your IBM employment will be terminated effective today, April 2, 2007."

158

The very next day, April 4, 2007, pursuant to a Court Order referenced in Paragraph 143 above, Plaintiff appeared before Her Magistrate Judge Janet F. King.

159

Consequently, the Court did not grant Defendant's request to "stay" Plaintiff's

lawsuit. As such, Plaintiff's right to file another lawsuit based on the "Right to Sue" letter issued by the EEOC on March 3, 2007 was sustained, and is hereby exercised

## **COUNT I**

### **Title VII and Retaliation**

160.

Plaintiff incorporates the allegations contained in Paragraphs 12 through 159, as if specifically pled herein.

161.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted Retaliation, in that Defendant took adverse action against Plaintiff because he engaged in statutorily protected conduct and expression.

162

All actions of Defendant, IBM, as complained of above, and other retaliatory actions not referenced herein, were on account of Plaintiff's race, sex and national origin, and in retaliation of the complaints Plaintiff made

163.

IBM was made aware of Plaintiffs complaints and the retaliatory activities of its agents and failed to address them.

164.

The actions of Defendant, IBM, were willful, wanton, intentional and in reckless disregard of Plaintiff's federally protected rights.

165.

Plaintiff has been harmed and has suffered as a result of the conduct of the Defendant, and Plaintiff is entitled to damages under the provisions of and in accordance with Title VII including compensatory damages, back pay, front pay, punitive damages and cost of litigation, all to be determined at trial.

## COUNT II

### Title VII and Hostile Work Environment and Harassment

166.

Plaintiff incorporates the allegations contained in Paragraphs 12 through 159, as if specifically plead herein

167.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted a hostile environment and harassment, in that the actions and/or inactions were so severe and pervasive that they altered Plaintiffs working condition and employment, and created on abusive

work environment, resulting in Plaintiff's wrongful termination.

## COUNT III

### Title VII and Disparate Treatment

Plaintiff incorporates the allegations contained in Paragraphs 12 through 159, as if specifically plead herein.

168.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted disparate treatment, in that Defendant treated similarly situated (Caucasian) and female employees more favorable than Plaintiff because of his race, national origin, and sex.

169

IBM's internal policies and practices, including but not limited to, Defendant's Internal Appeal processes, specifically, "Open Door," and "Panel Review," Performance Evaluation process, specifically, Personal Business Commitment (PBC), and promotional processes have systematically had an adverse impact on minorities because of their Race and National Origin resulting in unfair discipline and wrongful termination.

170

In fact, IBM's internal policies and practices (Open Door, Panel Review, PBC,

promotional, etc.) perpetuates and continues discriminations of the past.

In addition, IBM's internal policies and practices have created a statistical imbalance in its workplace to the disadvantage of minorities, based on their Race, Sex, and National Origin

## COUNT IV

## RETALIATION IN VIOLATION OF  SECTION 1981

171.

Plaintiff restates and re-alleges Paragraphs  12-159 of the Complaint as if fully set forth herein.

172.

By the conduct stated, Defendant retaliated against Plaintiff for engaging in protected activity in violation of  Section 1981.

## COUNT V

## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

173.

Plaintiff restates and re-alleges Paragraphs 12-159 of the Complaint as if fully set forth herein.

174.

By the conduct stated, Defendant discriminated against Plaintiff because of his gender in violation of Title VII.

Defendant systematically denies male employees benefits and privileges afforded to female employees.

Plaintiff avers that if he was a female, Defendant would've been more receptive, responsive (i.e timely), and would've appropriately addressed and put a stop to the harassment and hostile work environment Plaintiff was subjected to.

Plaintiff further avers that if he was a female, he would have been allowed to transfer to another position within IBM

## COUNT VI

## NATIONAL ORIGIN RETALIATION  IN VIOLATION OF TITLE VII

175

Plaintiff restates and re-alleges paragraphs 12-159 of the Complaint as if fully set forth herein.

176

By the conduct stated, Defendant retaliated  against and harassed Plaintiff because of his national origin in violation of Title VII.

177

The prohibitions of Title VII of the Civil Rights Act of 1964 (as amended) against harassment on the basis of National Origin are essentially the same as for sexual harassment. As such, IBM and its agents are liable for damages Plaintiff suffered on account of Defendant's willful, wanton , and deliberate (i.e.,premeditated) intention to subject Plaintiff to a hostile working environment, to affect Plaintiff's job performance resulting in Defendant's wrongful termination of Plaintiff.

## COUNT VII

**PRAYER FOR  RELIEF:**

       **WHEREFORE, PLAINTIFF prays that the Honorable Court:**

a) **Accept jurisdiction over this matter;**

b) **Empanel a jury to fairly decide this matter:**

c) **Award to Plaintiff and against Defendant's compensatory and punitive damages with pre and post-judgment interest;**

d) **Order defendant to cease and desist from its discriminatory and retaliatory practices;**

e) **Award to Plaintiff the reasonable attorneys' fees and necessary litigation costs relating to the prosecution of this matter, and;**

f) **Enter any order  in the interests of justice and/or equity require.**

**RESPECTFULLY** **submitted to the Court, Thursday, May 31, 2007.**

**Richard V. Harrison**
**Pro Se**
**2707 Forkview Place**
**Douglasvlle, Georgia, 30135-8689**
**(678)-391-8644**

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To   Harrison V. Richard<br>2707 Forkview Place<br>Douglasville, GA 30135 | From   Atlanta District Office - 410<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No | EEOC Representative | Telephone No |
|---|---|---|
| 410-2007-01728 | Arnold E. Bush,<br>Investigator | (404) 562-6948 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA): This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice, or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge

☒ The EEOC is terminating its processing of this charge

☐ The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Sylvia D. Haughn*                                    MAR 03 2007

Bernice Williams-Kimbrough,
Director                                        (Date Mailed)

Enclosure(s)

cc:   Ms. Wendy C. Wang
IBM Americas -- Staff Attorney
Southern & Southwestern Regions
1507 LBJ Freeway, 7th Floor
Dallas, Texas 75234

John D. Wales
Law Offices of John D. Wales
1950 Spectrum Circle, Ste 400
Marietta, GA 30067

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

Plaintiff, Richard V. Harrison, Pro Se, hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

Richard V. Harrison
(Pro se)